v. Oral Argument, 50 minutes per side. This briefing will be printed, appellants for all Good morning. Good morning. May it please the court, my name is Randy Freaking and I represent Mr. Burton on this appeal along with my co-counsel at trial, Barbara Bonar. I would like to reserve 7 minutes for rebuttal. As you can tell from the briefing in this matter, this was a highly contentious, largely race discrimination case and a case involving a termination and violation of public policy. There were two motions for summary judgment denied, a directed verdict in which the trial court judge kind of split the baby so to speak and threw out some of the claims and kept the most important claims still in. And there were various post-trial motions which were fully briefed and Judge Bertelsman issued a 40 page decision. The jury verdict itself and a lot of the issues on this appeal involve questions about the damages and so they come roughly in three buckets. The first bucket is the bucket of back pay in which the jury awarded $300,000 for the wrongful termination. Now what the trial court judge did here, which was smart and appropriate, was he only allowed the jury to award one bucket of lost pay damages even though there were two wrongful discharge claims. And so the damages overlap. He did not allow them to double dip. So the jury awarded $300,000 for the race discrimination termination and $300,000 for the public policy violation but they are the same damages and so it results in a total of $300,000 in back pay. There was also $50,000 awarded in emotional distress for the damages suffered by Mr. Burton with respect to the race discrimination and the hostile working environment and a separate $50,000 under the public policy tort when he was coerced unsuccessfully into trying to side with the company. You're representing the plaintiff, is that correct? Yes. You basically won. We won, yes. Are you arguing your cross appeal now or are you arguing to defend their... Oh, I'm sorry. We procedurally... Apologies, I'm just trying to figure out... Oh, that's okay. We appealed the judge's decision not to grant reinstatement or front pay. Is that what you're addressing now or are you addressing their cross appeal right now? Actually, I was just kind of giving a little background but I'll jump to the issue that we have. When you get to one of the issues. The reinstatement issue, Your Honor. In employment discrimination cases, a finding of intentional discrimination under Kentucky law, likewise with federal law, entitles the prevailing party to equitable relief to put him back in the position he would have been in but for the discrimination. And that's reinstatement or front pay. In Kentucky, it's the Brooks versus Lexington Lafayette case which says reinstatement is the presumptive remedy. It allows for a full remedy, returns a plaintiff to the position he would have been in and it serves as a defendant. Federal law provides guidance as to when reinstatement is appropriate or front pay. And what the defendant seems to argue and argued successfully to Judge Bertelsmann was that there was too much hostility among the parties for Mr. Burton to be reinstated. But what the court ignored was the most important fact was the person who was most responsible for creating this hostile work environment and committing the race discrimination was long gone. It was a human resource director, Sharon Martin. She's the one who was attributed to saying just a slew of reprehensible racial epithets that are obviously detailed in our brief in which, but our point on the appeal is she was gone. And so this hostility among the parties was really only hostility perhaps among the participants in the trial. That's like a clearly erroneous or abusive discretion kind of determination on the part of the judge as to whether there was hostility. Is that the argument? Yes. Don't we also, don't the courts also look at whether the plaintiff has found replacement work? And in this case, my understanding is that he had. He was employed, but it was not a comparable position. And there's nothing in the record. He was underemployed. When the courts have denied reinstatement or front pay, it's been in situations in which the plaintiff had secured alternative employment that was equal to or superior to and did not want to return to the prior workforce. The burden of proof with respect to reinstatement is on the defendant to prove it is inappropriate. And their defense here was basically we treated him so badly when he was here. We subjected him to so much racial harassment, we shouldn't have to take him back. That's rewarding them for their past bad acts. Just to finish up that thought, does the record reflect that the new employment, the replacement employment was not at commensurate level with the prior employment? As I understand, the new employment was at a company that does collections work. Yes. And he was doing, I guess, similar work, but for some reason you're saying it's not commensurate. I don't know if the record reflects that. Well, the record doesn't reflect that it was commensurate. You know, the beauty of this. The record says what? It's silent as to what he was on. It doesn't reflect one way or the other. That's right, because the defendant chose not to put on evidence of mitigation. But the beauty about Kentucky law is that unlike federal law, the district court judge decides both the issue of reinstatement or front pay. So it's a state law question. It's a state law question because this was a state law claim. I want to ask you about the cross appeal. Okay. The public policy claim is that your client was coerced into committing perjury. Is that right? Yes, coerced into possibly. But as I understand the record, the evidence which supported that and which the jury found, I guess, is that it was suggested to him that he not say the same thing that he'd been saying to counsel who were investigating. Is that right? Yes. What's your best case for saying that that amounts to either a public policy violation in general in Kentucky or whether it amounts to a subordination of perjury or the equivalent of that under Kentucky law for purposes of public policy? I think the best case we have, Judge Rogers, is nearly on point, which is Northeast Health Management, Inc. v. Cotton, actually cited by the defendant in the second brief. In that case, a supervisor was accused of shoplifting. She brought two employees in, and she said, I want you to testify that you overheard a conversation. Testify where? In a court. But we don't have that here, though, right? We do. There was a pending sexual harassment case, five women suing the defendant. Yeah, but is there we want you to testify in court or is it just be careful what you say to these investigators? I'm just asking you the question. I mean, it sounds like it's more than a little bit different. Maybe enough. Sure. I think you can. What's interesting. That's the closest case is what you're saying. I think that's the closest case here. You know, he was interviewed several times by defense lawyers who are defending the company in the sexual harassment case. He tells the defense lawyers, I'm siding with the women who are accusing the company of sexual harassment. And the COO, the chief operating officer, says, you need to make better decisions. The vice president, Koziol, you've exercised poor judgment. Your job is in jeopardy. And the co-director of operations, Ms. Walker, says, just tell the truth. He had been in five meetings. Tell the truth. Your job's not in jeopardy. Well, you've told a story, Clinton. Okay. You've told us A, B, C. Just tell us the truth. As if he's lying. There was no reason for them to think he was lying. They wanted him to tell, you know, side with them. Now, I'll note, what I like about the Cotton case, Judge Rogers, is that there's two conversations here. There's one supervisor involved. In our case, we have three higher-ups threatening him in connection with his support of the five women against the company. I think it's actually a stronger case under our facts than the case in Cotton. And Cotton's a 1996 case. Out of the Kentucky Court of Appeals. Out of the Kentucky Court of Appeals, Your Honor. Yeah. We silenced. It's been silenced. Out of where? Oh, I'll find it. Thank you. Yeah. I don't have it. Thank you. Mr. Hawkins. Good morning, Your Honor. Michael Hawkins with Dinsmore & Scholl along with Mike Mattingly on behalf of Swicker. Your Honor, I know we're both appellants. Do I also get some rebuttal time? Yeah, you should handle everything you have in your 15 minutes now. Okay. Thank you. I'll do that. So, Your Honor, there are two key issues in this case and to the court that I think resolve the whole matter. One is based on Kentucky law, which I'll get into. There's no public policy wrongful discharge for perjury, and that eliminates any need for a discussion of punitive damages. Secondly, the record is clear as pointed out in our briefs at pages 12 and 13 and 53 and 59 that plaintiff was only unemployed from the time of termination until trial for five months. And based on the testimony, which I'll get into, he was only entitled to back pay of $46,360 versus the 300. And this eliminates it. That was based on your failure to provide evidence. Is that right? No, Your Honor. This whole issue of mitigation, not mitigation, if you look at the record evidence and if you want to jump to the back pay issue, in Roush v. KFC, this court has made it clear that back pay must be reasonable and within the range of proofs. Jackson v. City of Cokeville, reasonable interpretation of the evidence. Hans v. Norfolk Southern, make plaintiff whole, not better off. And Rogers v. Fisher Body. You were given a chance to show what kinds of money he was earning during that period. Is that correct? Your Honor, it's not an issue of how much money. Were you given a chance to show that? Yes, they were. I did not handle it in an underlying trial. I mean personally. Right. His lawyer was given a chance to show that and declined to show it. Is that fair? That is true, Your Honor. But the issue is what is the record evidence? The record evidence is that he was employed 30 of the 35 months. That is the record evidence. I don't know how much, though. Pardon? I don't know how much. Well, if you're looking at back pay, back pay is what was he making when he was with Zwicker. The evidence is clear that for the five months in 2010, he made $46,360. So if you look at it, and we've pieced it all together in the brief, what other employment did he have? Well, he took employment in August of 2010. So June, July, and August he takes a job. Then he works from that point in time. The point is we don't know what he, I thought the district judge's point was we don't know what he earned during that time. Well, Your Honor, it doesn't. And from the district court's perspective, it's because you didn't show what he earned. Your Honor, let's presume he earned nothing, he had no employment. What would the number be calculated on? It would be calculated on the basis of what was his last month's pay? $9,000. You're dealing with what the, before the reductions, what the amount was? No, Your Honor. I mean, the point of the matter is to calculate back pay, someone takes, okay, how many months were you unemployed? I was unemployed 10 months. How much did you make per month in your last job? I made $9,000 a month. 9,000 times 10 months. I thought there was evidence. Maybe I'm misremembering. I thought there was evidence that during a third of the year he earned so much and you multiply that by 3 by the number of years and got up to $350 or something. Well, Your Honor, in their own closing argument, and this is plaintiff's closing argument on the back pay issue, now we're going to get to back pay, these elements of back pay. As you know from the record that Mr. Burton made $46,000 in the first 4 plus months of 2010.  It was the best job he ever had. He's been out of work for 35 months. That is untrue. So the jury is being told he's been out of work 35 months when, in fact, he's worked 30 of the last 35 months. At the day of trial, he's employed. So that is clearly, under the Roger Fisher case, a closing argument that's potentially unfair to influence the jury on speculative numbers. And what does the jury come back with? The jury offers him $300,000. But was there evidence of what he made during those? No, Your Honor. He didn't put it on and you didn't put it on. He didn't put it on. Given the explicit chance to put it on. Correct. Did you address the public policy issue? Yes, Your Honor, I will. So this court has made it clear and so has the Kentucky courts in both the Welsh v. Phoenix transportation case. It says, in fact, the court goes on to say, least there be any confusion, the plaintiff must show an affirmative request to violate the statute. Under Northeast Health Management, it says, and it's a case that the plaintiff wants to rely on, but it says the employer must explicitly request that the employee perjure himself before liability attaches. You don't think there's liability under the public policy law in Kentucky if they go to a potential witness and say, lie on the stand? Your Honor, there was no lie on the stand. I'm asking a question. If they go to a witness and say, lie on the stand, or you will be fired, and he says, I will not do that, and they fire him, is that a violation? Yes, Your Honor. That is. So you don't actually have to lie on the stand. You can just be asked and have your refusal be a basis for firing. Is that right or wrong? I don't know the law. Your Honor, if you request an employee to lie, commit perjury, lie on the stand in a judicial proceeding, and he says, no, I'm not going to do it, and you fire him, that would be the basis for a public policy claim, correct? And you admit that, and you also agree that whatever happened in Cotton would be enough. Is that correct? Well, in Cotton, the supervisor specifically told the people to lie under oath. Right. So the difference is not whether he lied under oath, but whether he was being asked to lie under oath. Is that correct? Correct, Your Honor. So when you say, oh, you've got to show that he lied under oath, that's not required. Yes, it is. Well, you just got through giving me two examples where he never lied under oath. You have to be specifically instructed to lie under oath. Instructed to lie under oath. Yes. And I couldn't let a jury find here that he was instructed to lie on the oath. That's not lie under oath. It's not an answer to say, well, he didn't do it, because under your examples, he didn't do it. Well, the question is whether he was asked to do it. Your Honor, the situation he was placed in wasn't anything to do with under oath. Under Kentucky revised statute, so the law all the He was asked to lie not under oath, perhaps. I mean, some evidence, perhaps. I think the evidence is clear he wasn't asked to lie at all. Nobody asked him. But a jury could possibly believe. Well, I would submit under the law that you I'm trying to get at the question. But under Kentucky revised statute 523.02, which is perjury in the first degree, it says a person is guilty of perjury in the first degree if he makes a material statement which he does not believe in an official proceeding under oath required by law. So that particular perjury requires that you be involved in a judicial proceeding and be instructed to lie under oath. If you look at 0 The way I understand their argument This is what I'm trying to get at, whether you're right or wrong. The way I understand their argument is these people are being asked indirectly with a bunch of mumbo jumbo to lie on the stand. And the way they're being asked to do that is it's hinted in a way that the jury could figure out, the argument goes, that they were asked to lie on the stand because they're being asked to lie to the people who are trying to figure out what they will say on the stand if they're ever called as a witness. And so, you know, usually when people solicit illegal activity, they're subtle about it. That's why we have juries. Why isn't this, and this is my question, I don't know the answer, why isn't this something where a jury could find that with a wink and a nod, these people were being asked to lie on the stand? Is it because the jury instructions don't say that? Or is it just because there's not enough evidence? The jury instruction says nothing about it. It just says, was he instructed to commit perjury?  Was he terminated because he refused to commit perjury? Right, and they found liability based on that, right? Yes, they did. But why isn't this evidence sufficient to find that? Because, Your Honor, the Kentucky courts, in that Phoenix case, health management, Chavez v. Dakota, it says it can't be based on subjective belief, and the judge even says, well, he so interpreted it. The judge doesn't say there was evidence of an instruction to commit perjury, he refused, he was fired for it. And in Fleming v. Flaherty, it says it must demonstrate affirmative request to violate the statute. So you have to have a specific request under Kentucky law to violate a statute. What statute? The perjury statute. And I pointed out 020, 030 says a person is guilty of perjury in the second degree when he makes a material false statement which he does not believe in a subscribed written instrument for which an oath is required. Mr. Burton was never in any situation to testify. Nobody talks about being a witness in anything, in any judicial proceeding, and nobody talks about, and there was never any reference in the trial, in the record, to a judicial proceeding or a written statement or you're going to have to give an oath or you're going to have to sign an affidavit. I understand, though, that you're asking us to say the jury got the facts wrong. No, I'm saying that the judge, as a matter of law, knows what perjury, we all in this room know what perjury means. And this was not perjury. Even if it was to, hey, go in there to the lawyers and tell them to change the facts. If what the jury found was that they were asked indirectly with a wink to lie on the stand, if it ever came to that. Well, Your Honor, it would be nice if it was, be sure and lie on the stand. You're going to be called a witness. There was never even this discussion about you're going to be a witness in a case or anything. It was like, please go. All that was understood. You're just saying, I understand your argument to be saying there wasn't enough evidence for the jury to find this, but you want to turn it into a legal issue. That's where I'm having trouble. Well, the Kentucky courts have turned it into a legal issue and overturned these kind of exact cases where there wasn't specific instruction to commit perjury and there wasn't a judicial proceeding involved and there wasn't a written affidavit involved. And in addition, there's no causal connection. I mean, this takes place some six to eight, and even in closing argument, plaintiff says 12 months before he's actually terminated. And this court's been very clear on those kinds of issues that if you've got that kind of space and time, you need substantially more evidence than just, oh, well, this happened and now we had six, eight, ten, twelve months pass. The other thing on the punitive damages issue, it's very clear that punitive damages involves a deprivation of property right. And the U.S. Supreme Court, this court, and the Kentucky courts have all made it clear that before you're going to deprive somebody of a property right, as in punitive damages of $600,000, you need to make darn sure that they have violated a law. So that's why the Kentucky courts have made it abundantly clear there must be an explicit request to commit perjury, refusal to do so, and termination, not some wink of the eye, well, I inferred from this, and particularly in the Dakota case, we can't rely on an interpretation. On the punitive damages issue, while I think the public policy addresses it and eliminates it, this court in Highland, well, excuse me, not this court, but Highland Hospital versus Castle, Kentucky court, talked about punitive damages was animated by passion and prejudice to draw that out of the jury. In this particular case in closing arguments, in three different places, page 55, page 71, and page 76 of the closing, plaintiff's counsel does solicit that passion and prejudice on the jury because all they talk about in terms of penalizing the company is about the race issue. And specifically at page 75, excuse me, 76 of the closing, they say punitive damages is your final measure. That's where you send a message to Andover and you send it to other employers within this community. If you have a racially hostile work environment, if you tolerate a human resources director that can say BNT without repercussions, you're going to be penalized. And very specifically, the Kentucky courts have made it clear that punitive damages are not available for the KRS 344 race discrimination case. So what we have here is counsel who has incited the jury to go punish this company with punitive damages because of this race issue. They don't even mention punitive damages in the context of this public policy. And the other thing else that I would mention is that the plaintiffs knew darn good and well that this was not a perjury issue. In fact, in the jury charge dialogue at page 89 and thereabouts, plaintiff's counsel is trying to get the judge to just have an instruction for refusing to falsely support. And the judge is like, well, what's really going on here? Is that really a public policy issue? And plaintiff's counsel even says, well, if it's going to be perjury, that suggests he's under oath in a courtroom or something. So we have the plaintiff's counsel recognizing I don't have perjury here for Mr. Burton. What I've got is I'm going to try to squeeze a public policy claim under this other issue. And the judge has ended up, no, it's going to be perjury. That's public policy. And then they say, well, but judge, that's really testifying under oath in a court of law, and we don't have that here. Yeah, you're right. We don't have it here, and that's why this public policy claim needs to be dismissed, and it was disingenuously argued. With respect to the reinstatement front pay issue, this Arbonne v. West Publishing Company in 03, the Sixth Circuit said, if you don't provide data for the plaintiff to calculate for the court to calculate a reasonably certain amount, you don't get front pay. And in addition, I mean, they can say this one person's gone, but you just heard allegations against Mr. Cozio, Mr. Twight, others who still work for the company, about how bad a person they are, and they tried to commit him to commit perjury, which we dispute. So, you know, basically we request that the court reverse the district court on the denial of judgment as a matter of law on the public policy issue, remit the punitive damage, I mean, the back pay to $46,360 based on the record evidence, and reverse the district court on the back pay award. In addition, with the back pay award reduced, it clearly impacts the constitutionality of the punitive damages claim and affirm the court on the reinstatement and front pay. Thank you, Your Honor. Thank you, Mr. McLaughlin. Mr. Freaking? Thank you. With respect to the public policy claim in the Northeast Health Management Inc. case versus Cotton, neither one of those employees who were the plaintiffs ever was asked to appear at a trial or be under oath. It's exactly the same situation. What the case actually says is that Cotton and Howell claimed that Dennis wanted them to testify that they overheard a conversation over the speakerphone between Dennis and an employee at the tanning salon. There's nothing where the supervisor said, we want you to perjure yourself. The defendant keeps saying, and they just say it in their briefs without really reading the case, is that Cotton stands for a proposition that the employer has to say, we want you to perjure yourself. What's interesting is the court, in analyzing those words, says, yeah, what they wanted to do was to perjure themselves. Now, they never testified anyplace. It's the same thing here. The jury concluded that after he was interviewed five times by lawyers and three supervisors come to tell him, your job's in jeopardy, you're making bad judgments, and you better go tell the truth, that they were intimidating him. And we did mention this in the charge conference. We actually cited to a statute rather than Cotton, but we cited to the statute KRS 524.040 at page 9516 of the joint appendix. So I think what happened here is the jury made the inference that that's exactly what they were trying to do with this wink and a nod. They didn't like what he was saying, and Clinton, you better change what you're telling us, because we've got to defend this sexual harassment lawsuit, and we don't like the fact that you are standing up for the women who are charging us with sexual harassment. Now, I do want to address the... What's the full name of the Cotton case? Northeast Health Management, Inc. v. Cotton. That's cited in your briefs? Yes. It was actually cited by Judge Bertelsman. It's cited in your briefs? Yeah, it's in actually the principal brief of the defendant. Third brief? In the second brief. It was cited by them. It was cited by them, not cited by you. Correct, and we think cited wrongly. On the punitive damage issue, we would request that the court look at one particular case in the Sixth Circuit, Bridgeport Music, Inc. v. Justin Combs. What's interesting about that case, Judge Rogers, you were on that panel. You found one indicia of reprehensibility in that case. We believe there are four indications of reprehensibility in this case, but Judge Bertelsman thought there was one. So let's just go with that for a second. In the Bridgeport Music, Inc. case, the Sixth Circuit concluded that a ratio of 1 to 1, between 1 to 1 and 2 to 1, would meet the constitutional requirements of due process. Here what the jury awarded was a ratio of 1.7, and Judge Bertelsman knocked it down to 1 to 1. But I think the closest case we could find where it's discussing the reprehensibility factors says anywhere between 1 and 2 is fine. And so we believe that the court should defer to the jury. We have a large corporation here. Under Kentucky law, you can actually look at the profitability of the defendant, but we're looking at the constitutional standards. And this act was particularly reprehensible because the defendant is a law firm. And if anybody should know that you should not threaten or coerce an employee when they're giving you their side of the story in defense of a sexual harassment case, it's a defendant law firm. This is particularly reprehensible because of that. We believe it's also reprehensible under the five factors we think we meet for. The plaintiff was financially vulnerable. I mean, he was a single parent. Sure, he had a good job, finally, after many years in this industry. He was making the equivalent of about $111,000 per year. But a single parent, he was financially vulnerable, because if you're fired, you're obviously in a bad state. There were also repeated actions. That's another one of the tests for reprehensibility and the ratio. Here we have three different supervisors coming to Mr. Burton and telling him, in essence, you better change your story. And the case also involved a substantial amount of trickery or deceit. There was a substantial number of examples cited in our briefs and throughout the trial where the company tried to get other witnesses to sign affidavits that were false, one in connection with his termination. There was a Michelle Tomorrow example. There was a Connie Reese example. So arguably four of the five reprehensibility factors were present. And so we think if you look at Bridgeport Music case, that a ratio between one and two is acceptable to meet the due process concerns. The jury here applied, and it was a 1.7 to 1 ratio. And we believe that that's the appropriate ratio and that you should reinstate the full amount of punitive damages awarded to Mr. Burton. With respect to the front pay and reinstatement issue, all we're asking is for a remand to Judge Bertelsman. We believe he should conduct a hearing to apply the Roush factors and decide whether reinstatement was appropriate. We believe he will conclude it was. And if he concludes that reinstatement is not appropriate, then he should hold a hearing on the amount of front pay to be awarded. Thank you for your time. Okay. Thank you, counsel, both of you, for your arguments today. We really do appreciate them. The case will be submitted. I think that concludes our oral argument calendar. There is a case that is submitted on the briefs. No need to call it. So you may adjourn court.